**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DONOVAN JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20-cv-06500 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| SHERIFF THOMAS DART, et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Donovan Johnson has sued Cook County Department of Corrections

("CCDOC") Officers Tamara Anderson, Daniel Johnson,[1] Michael Parker, Crystal McSwain,

Christina Mendoza, James Ludwig, Olivia Day, Delilah Serrano, and Martin Garcia (collectively,

"Defendants"), alleging excessive use of force, along with failure to protect or intervene, in

violation of the Fourteenth Amendment to the Constitution. Now before the Court is Defendants'

motion for summary judgment. (Dkt. No. 63.) Defendants argue that the statute of limitations

bars Johnson's claims. Alternatively, they contend that the officers' use of force was objectively

reasonable such that no constitutional violation occurred and that the defense of qualified

immunity precludes liability. For the reasons stated below, the Court grants Defendants' motion.

**BACKGROUND**

The following facts are undisputed unless otherwise noted.

---

[1] For purposes of this opinion, the Court refers to Plaintiff Donovan Johnson, as "Johnson," and
Defendant Daniel Johnson by his full name.

## I. Factual Background

On August 31, 2017, Johnson entered the CCDOC as a pre-trial detainee. (Pls.' Resp. to Def. Statement of Material Facts ("PRDSF") ¶ 17, Dkt. No. 85.) Several months later, on December 30, 2017, Johnson returned from recreation to find several personal items missing from his cell. (*Id.* ¶ 42.) After notifying several officers, Johnson retrieved some, but not all, of his possessions. (*Id.* ¶¶ 42–43.) That same day, Johnson learned that he would be housed elsewhere in the facility. (*Id.* ¶ 44.) In preparation for the move, Johnson was temporarily detained in an attorney-client meeting room. (*Id.*) While there, Johnson informed Lieutenant Anderson that he was missing various personal items. (*Id.* ¶ 47.) Later, when Anderson returned, she told Johnson that despite her best efforts she could not locate his belongings. (*Id.* ¶ 49.) The parties dispute what happened next. Defendants claim that Johnson communicated to Anderson that he would not leave the meeting room willingly unless he received his lost items. (*Id.*) Johnson, on the other hand, states that he consented to the relocation from start to finish because it was for his own safety. (*Id.*)

Based on her belief that Johnson was not cooperating, Anderson left the room and devised a plan to relocate him using OC spray ("pepper spray"). (*Id.* ¶ 50.) CCDOC employees are subject to the Cook County Sheriff's Policy ("Policy"), which states that the application of pepper spray to compel an unwilling individual to comply constitutes a "use of force." (*Id.* ¶ 30.) When, as here, the application of pepper spray is pre-planned, the Policy instructs that a supervisor must create a plan, enlist support from colleagues as needed, decontaminate the individual sprayed, and refer the individual sprayed for medical treatment. (*Id.* ¶¶ 38–41.) Before reapproaching Johnson, Anderson secured assistance from Officers Daniel Johnson, Garcia, and Parker. (*Id.* ¶ 50.) Additionally, Anderson informed medical staff of her plan to pepper spray Johnson and assigned Mendoza to record the incident with a handheld camera. (*Id.*)

2

What follows is the Court's summary of the video evidence, with the parties' factual disputes identified as they arise. The footage begins with Anderson opening the meeting room door (Camera Footage, 00:01–00:06, Dkt. No. 77.). Sergeant Day is behind her, though she is not visible in the footage. (PRDSMF ¶ 56.) Anderson first asks Johnson, who is in handcuffs, to leave the room so that he can move to his new housing assignment. (Camera Footage, 00:17.) Johnson does not leave the room, stating, among other things, that he "needs his stuff." (*Id.* at 00:22–00:25.) In response, Anderson again orders Johnson to leave. (*Id.* at 00:24–00:27.) In response, Johnson repeatedly tells Anderson to "spray him" and continues to state that he has not received his lost belongings. (*Id.* at 00:30.) Anderson repeats her request that Johnson leave the room multiple times, but Johnson does not do so. (*Id.* at 00:30–00:38.) A back-and-forth ensues until Anderson applies a single burst of pepper spray to Johnson's face, an act the footage does not capture because the camera pans away. (*Id.* at 00:30–00:39.)

The parties characterize the interaction immediately preceding Anderson's use of pepper spray in different ways. Defendants claim that Johnson refused to leave the room; Johnson, however, asserts that he never refused Anderson's instructions. (PRDSMF ¶¶ 52–55.) Overall, the footage shows that Anderson ordered Johnson to leave the room fourteen times, over the course of approximately thirty seconds, before she sprayed him. (*Id.* at 00:07–00:39.)

Once the footage refocuses, Johnson is shown with his shirt draped over his face; surrounding him are three officers, who drag him out of the room and into the hallway. (Camera Footage, 01:10–01:28.) Next, the footage depicts Johnson lying on the floor. (*Id.* at 01:31.) He is flanked by several officers, though at points none of them are touching him. (*Id.* at 01:46–01:48.) Anderson repeatedly instructs Johnson to get up from the floor. (*Id.* at 01:47–01:49.) When he does not comply, four officers lift him to his feet and force his back against a wall (*Id.* at 01:54–

02:00.) Several other officers are observing the incident, including Day. (*Id.* at 01:57; (Defs.' Mem. in Supp. of Mot. for Summ. J., Ex. R, Day Deposition, Dkt. No. 64–18 at 58:13).

As Johnson stands restrained against the wall, the officers notice that he has an item tucked underneath his waistband. (Camera Footage, 02:18–02:24.) According to Defendants, the officers proceeded to remove the item to confirm that it was not a weapon. (PRDSMF ¶ 61.). For his part, Johnson admits that he had an item in his waistband but asserts that Defendants already knew that it was a bundle of mail. (*Id.*) As the officers reach for the item, Johnson attempts to wrest away from their control. (Camera Footage, 02:36–02:38.) According to Defendants, Johnson did so by flailing his arms and kicking his feet in a violent manner. (PRDSMF ¶ 59.) Johnson disagrees with this characterization, stating that he did not resist. (*Id.*) In response to Johnson's movement, which the footage depicts, one of the officers observing the incident, seemingly a supervisor, instructs the others to "take him down." (Camera Footage, 02:38.) Working in unison, three officers then take Johnson down and pin his face against the floor. (*Id.* at 02:38–02:42.) Over the course of several minutes, the officers fasten Johnson's hands behind his back and apply restraints to his feet. (*Id.* at 02:42–04:20.) The parties dispute whether Johnson resisted. (PRDSMF ¶ 65.) After lifting Johnson upright, the officers escort him to the decontamination room, where they apply water to his face, and then the footage concludes. (Camera Footage, 04:36–06:26.)

Later that day, paramedics transported Johnson to Cermak Health Services, whose staff subsequently referred him to John H. Stroger, Jr. Hospital ("Stroger Hospital") for further evaluation. (PRDSMF ¶¶ 70–71) There, Johnson was prescribed pain medication and crutches; he also received a referral for physical therapy. (*Id.* ¶ 73.) Johnson returned to CCDOC the next day. (*Id.* ¶ 76.) The parties dispute the extent of Johnson's injuries. Johnson contends that a

physician at Stroger Hospital diagnosed him with blunt head trauma incurred as a result of the incident. (*Id.* ¶ 74.) Defendants dispute this assertion. (*Id.*) Both sides agree that Johnson's head, spine, and neurological examinations did not return any abnormal findings. (*Id.* ¶ 73.) In 2022, Johnson received a head CT scan upon referral from a medical provider. (*Id.* ¶ 77.) The parties agree that its results did not reveal any abnormalities. (*Id.*)

## II. Procedural History

In response to the December 2017 incident, Johnson filed two consecutive lawsuits. Johnson first filed suit on August 21, 2019.[2] Acting *pro se*, Johnson alleged that Day, Anderson, and numerous unknown officers used excessive force when they sprayed him with pepper spray, slammed him to the ground, and stood on his back.[3] On November 22, 2019, Johnson's case was dismissed without prejudice after he did not update his address with the Court or execute service forms for Defendants.

Represented by counsel, Johnson brought the instant case on November 2, 2020.[4] While the core factual allegations remained the same, this time Johnson named as Defendants County of Cook, Dart, and "Unknown Officers," along with Day and Anderson, who he sued in the first case. (Compl. ¶¶ 6–11, Dkt. No. 1.) Months later, on February 8, 2021, Johnson identified some of the Unknown Officers in his First Amended Complaint ("FAC")—specifically, Ludwig, Daniel Johnson, Parker, Garcia, McSwain, Mendoza, and Serrano. (FAC ¶¶ 8–19, Dkt. No. 9.)

---

[2] The first case is captioned *Johnson v. Dae et al.*, Case No. 19-cv-04663 (N.D. Ill.).

[3] Although Johnson's complaint referenced unknown officers, he did not name formally name them as Defendants.

[4] This case was originally assigned to now-Chief Judge Virginia Kendall. Pursuant to Local Rule 40.3(b)(2), the case was reassigned to Judge Robert Dow as a refiling of *Johnson v. Dae et al.*, Case No. 19-cv-04663. The case was subsequently reassigned to this Court on October 10, 2022.

With his FAC, Johnson asserts three counts. Count I, a 42 U.S.C. § 1983 claim, alleges that Ludwig, Anderson, Daniel Johnson, Parker, Garcia, and McSwain used excessive force in violation of the Fourteenth Amendment. Count II, also a § 1983 claim, alleges that Day, Mendoza, and Serrano failed to protect Johnson and intervene in the use of excessive force—also in violation of the Fourteenth Amendment. Lastly, Count III brings a state-law claim for intentional infliction of emotion distress ("IIED") against all Defendants.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants moved to dismiss the case for failure to state a claim on which relief can be granted. (Dkt. No. 31.) Their motion was denied as to Counts I and II but granted as to Count III. (Mar. 31, 2022, Mem. Op. and Order, Dkt. No. 34.) With respect to Counts I and II, the predecessor Judge rejected Defendants' argument that the statute of limitations bars the § 1983 claims, holding that the Illinois Savings Statute ("Savings Statute"), 735 ILCS 5/13–217, applies because the first lawsuit was dismissed for want of prosecution. The predecessor Judge noted, however, that although the November 2020 complaint is rendered timely by the Savings Statute, the FAC is not. Even so, Counts I and II survived the motion to dismiss as to all Defendants—including those first named in the FAC— because the predecessor Judge reasoned that the "relation back" doctrine could, at a later stage in the litigation, salvage claims against Defendants not identified within the limitations period depending on what those late-added Defendants knew or should have known during the 90-day period after the filing of the original complaint.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023) (quoting Fed. Civ. P. 56(a)). "A dispute is 'genuine' 'if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party.'" *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986)). Courts may consider the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" in deciding a motion for summary judgment. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting Fed. R. Civ. P. 56(c)). "It is not for courts at summary judgment to weigh evidence." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). But "where a reliable videotape clearly captures an event in dispute and blatantly contradicts one party's version of the event so that no reasonable jury could credit that party's story, a court should not adopt that party's version of the facts for the purpose of ruling on a motion for summary judgment." *McCottrell v. White*, 933 F.3d 651, 661 (7th Cir. 2019).

## I. Statute of Limitations

Defendants argue that the statute of limitations bars Johnson's remaining claims. Section 1983 does not provide an explicit statute of limitations; instead, courts borrow the forum state's personal injury limitations period. *Ray v. Maher*, 662 F.3d 770, 772 (7th Cir. 2011). Under Illinois's Savings Statute, that period is two years. *Woods v. Ill. Dep't of Child. & Fam. Servs.*, 710 F.3d 762, 766 (7th Cir. 2013) (citing 735 ILCS 5/13–217)). Only four circumstances implicate the Savings Statute:

> "1) if judgment is entered for the plaintiff, but reversed on appeal, or 2) if there is a verdict in favor of the plaintiff and, upon motion in arrest of judgment, the judgment is entered against the plaintiff, or 3) the action is voluntarily dismissed by the plaintiff, or the action is dismissed for want of prosecution, or 4) if the action is dismissed by a United States District Court for lack of jurisdiction."

*Mares v. Busby*, 34 F.3d 533, 536 (7th Cir. 1994) (citing 735 ILCS 5/13–217). When the Savings Statue applies, a plaintiff may "refile a cause of action within one year following the entry of [the] dismissal order[] or within the remaining period of limitations, whichever is greater." *Eighner v. Tiernan*, 184 N.E.3d 194, 199 (Ill. 2021).

Defendants assert that Johnson's claims are untimely because he filed this lawsuit on November 2, 2020—more than two years after the incident. Their argument draws no distinction between Johnson's complaint and his FAC. Both are untimely, Defendants contend, because Johnson's claims accrued on December 30, 2017—the day of the incident. But this argument ignores the prior finding that the first action was dismissed for want of prosecution and thus falls under the Savings Statute. (Mar. 31, 2022, Mem. Op. and Order, Dkt. No. 34.); *cf. Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022) ("When a case is transferred between district judges midway through litigation, the doctrine discourages the new judge from reconsidering rulings made by the original judge." (citation omitted)). Under the Savings Statute, Johnson was permitted to refile his case up to one year following the dismissal of the first suit; in other words, by November 22, 2020. Because Johnson brought this case on November 2, 2020, his claims against those Defendants named in the original complaint—Anderson and Day—are not time-barred.

Johnson's claims against those Defendants first named in the FAC require a different analysis. Filed on February 8, 2021—outside of the Savings Statute's limitations period—the FAC identifies as Defendants various officers who were denoted as "Unknown" in the original complaint. The new claims in the FAC might nonetheless be timely if they relate back to another timely filed pleading. Under Federal Rule of Civil Procedure 15(c), an amended pleading that "'relates back' to the date of a timely filed original pleading. . . is thus itself timely even though

it was filed outside an applicable statute of limitations." *Krupksi v. Costa Crociere S.p.A*, 560

U.S. 538, 541 (2010). Rule 15(c)(1)(C) explains that an amendment altering parties properly

relates back to the original pleading when:

> (C) … Rule 15(c)(1)(B) is satisfied and if, within the period
> provided by Rule 4(m) for serving the summons and complaint, the
> party to be brought in by amendment:
>
> (i) received such notice of the action that it will not be prejudiced
> in defending on the merits; and
>
> (ii) knew or should have known that the action would have been
> brought against it, but for a mistake concerning the proper party's
> identity.

Fed. R. Civ. P. 15(c)(1)(C).

*Krupksi* concerned a misnamed defendant rather than unknown defendant. 560 U.S. 538.

The plaintiff in *Krupski* first sued Costa Cruise. *Id.* at 543. Then, after the limitations period

expired, the plaintiff learned that Costa Cruise was merely a sales agent operating on behalf of

the proper defendant—Costa Crociere—and thus sought leave to amend their complaint. *Id.* at

543–544. Interpreting Rule 15(c)(1)(C), the Supreme Court held that "relation back . . . depends

on what the ***party to be added*** knew or should have known, ***not*** on the amending party's

knowledge or its timeliness in seeking to amend the pleading." *Krupski*, 560 U.S. at 541

(emphasis added). The Supreme Court went on to explain that on the facts of that case Costa

Crociere "should have known that [the plaintiff's] failure to name it as a defendant in [the]

original complaint was due to a mistake concerning the proper party's identity." *Id.* at 556.

Accordingly, the Supreme Court held that the amendment related back. *Id.*

After *Krupski*, some courts in this District applied its rationale in a different context:

untimely amendments identifying previously ***unknown*** defendants, often styled as John or Jane

Doe. *See, e.g.*, *Harris v. Dart*, No. 18 C 5222, 2020 WL 60201, at *4 (N.D. Ill. Jan. 6, 2020)

("This Court and others in this District have concluded that the appropriate inquiry after *Krupski* in cases in which the proper defendant's identity is unknown is what the late-added defendants knew or should have known."). Adopting *Krupski*'s "defendant-focused" analysis, those courts held that relation back inquiries no longer turned on the plaintiff's lack of knowledge, or their delay, but instead what the late-added, previously unknown defendants knew or should have known during the 90-day period after the filing of the original complaint. *See, e.g.*, *Clair v. Cook County*, No. 16 C 1334, 2017 WL 1355879, at *4 (N.D. Ill. Apr. 13, 2017) (holding that under *Krupski*, "the court must limit its inquiry under Rule 15(c)(1)(C)(ii) to what the newly named defendants knew or should have known"); *White v. City of Chicago*, No. 14 cv 3720, 2016 WL 4270152, at *20 (N.D. Ill. Aug. 15, 2016) ("[A]fter *Krupski*, the traditional John Doe rule should not be applied to prevent relation back if a plaintiff seeks to determine the identity of the John Doe defendant before the statute of limitations expires but is unable to do so."). Indeed, in this case, the previously presiding Judge adopted the defendant-focused approach at the motion to dismiss stage, permitting Counts I and II to proceed under the relation back doctrine subject to a developed record revealing that the added officers knew—or should have known—about the original complaint. Now, with a fuller record in hand, Johnson contends that the FAC properly relates back for this exact reason.

But Johnson's argument is foreclosed by the Seventh Circuit's post-*Krupski* decision in *Hererra v. Cleveland*, 8 F.4th 493, 495 (7th Cir. 2021). In that case, a pre-trial detainee acting *pro se* timely filed a complaint against three unknown correctional officers. Unaware of the officers' identities, the plaintiff named the defendants as John Does. *Id.* at 495. Later, after the limitations period had expired, the plaintiff amended his complaint to identify the officers by name. *Id.* at 495–496. The officers moved to dismiss, arguing that the plaintiff's claims were

time-barred and did not relate back to his original complaint. *Id.* at 496. The district court denied

their motion, holding that because *Krupski* effectively overruled the John Doe rule, the operative

question was whether the newly added officers knew, or should have known, about the lawsuit

during the 90-day period after the complaint was filed—evidence of which was not before the

court at the motion to dismiss stage. *See Hererra v. Cleveland*, No. 18 C 6846, 2020 WL

1548954, at *3 (N.D. Ill. Apr. 1, 2020), *rev'd*, 8 F.4th 493 (7th Cir. 2021).

The Seventh Circuit accepted the officers' interlocutory appeal, clarifying that *Krupski*

"neither overruled nor undermined our circuit's treatment of the John Doe issue." *Id.* at 499.

*Krupski*'s interpretation of "mistake" cannot be transposed to unknown defendant cases, the

Seventh Circuit explained, because unlike cases involving misnamed defendants, "[n]aming a

John Doe defendant as a nominal placeholder is not a wrong action proceeding from inadequate

knowledge; it is a proper action on account of inadequate knowledge." *Id*. In other words, "suing

a John Doe defendant is a conscious choice, not an inadvertent error." *Id.* As such, the Seventh

Circuit held that "naming a John Doe defendant does not constitute a 'mistake' within the

meaning of Rule 15(c)(1)(C)(ii)." *Id.* at 498.

*Hererra* is directly on point here. Johnson sued "Unknown Officers" in the original

complaint and later filed the FAC after ascertaining their true identities. The problem for

Johnson is that he did so on February 8, 2021—three months after the protections of the Savings

Statute expired. On these facts, the relation back doctrine cannot cure Johnson's untimeliness.

*Hererra* makes clear that suing "Unknown Officers" as a nominal placeholder is not a mistake

under Rule 15(c)(1)(C)(ii). *See id.* at 499; *Dickerson v. City of Chicago*, No. 21-cv-2955, 2022

WL 3369271, at *3 (N.D. Ill. Aug. 16, 2022) ("Based on *Herrera*, Plaintiff's failure to name the

individual Defendant Officers prior to the expiration of the statutes of limitation means that the

amended complaint does not relate back to the original complaint and Plaintiff's claims against the [newly added] Defendant Officers are untimely"); *Love v. Dart*, No. 19 C 2762, 2022 WL 797051, at *7 (N.D. Ill. Mar. 16, 2022) (holding that under *Hererra* "the fact that the plaintiff lacked information about the unknown defendants' identities meant that did he not make a 'mistake' within the meaning of Rule 15."). Accordingly, the Court finds that the statute of limitations bars Johnson's claims against those Defendants first named in the FAC.[5]

Defendants Ludwig, Johnson, Parker, Garcia, and McSwain are therefore entitled to summary judgment on Count I; and Mendoza and Serrano are entitled to summary judgment on Count II. However, Johnson's claims against Anderson (Count I) and Day (Count II) may proceed, as each were named in the original complaint, which, as explained above, was rendered timely by the Savings Statute.

## II. Merits of Fourteenth Amendment Claims

The Court next turns to the surviving counts. Johnson alleges that Anderson's use of pepper spray constituted excessive force (Count I). In addition, Johnson asserts that Day failed to him protect from—or intervene in—the use of excessive force, namely, the use of pepper spray and subsequent take down (Count II).

The Fourteenth Amendment's Due Process Clause governs Johnson's claims. *Kemp v. Fulton*, 27 F.4th 491, 498 (7th Cir. 2022); *Forrest v. Prine*, 620 F.3d 739, 743 (7th Cir. 2010). To prevail on a claim of excessive force, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v.*

---

[5] Because Johnson does not offer any arguments related to equitable tolling, the Court declines to consider whether the doctrine could salvage his claims against the officers first named in the FAC. *See Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996) ("Given our adversary system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." (citation omitted)).

*Hendrickson*, 576 U.S. 389, 396–397 (2015). The same standard also applies to Johnson's failure-to-protect and failure-to-intervene claims. *See Kemp*, 27 F.4th at 497 (holding that the objectively-unreasonable standard from *Kinsgley* applies to failure-to-protect claims brought by pretrial detainees); *Ward v. Brown*, No. 18-cv-02798, 2022 WL 1404824, at *7 (N.D. Ill. May 3, 2022) (explaining that a plaintiff bringing failure-to-protect and failure-to-intervene claims must show that defendants' conduct was "objectively unreasonable").

Courts evaluating objective unreasonableness examine "'the facts and circumstances of each particular case . . . from the perspective of a reasonable officer on the scene, including what the officer knew at the time.'" *Thomas v. Dart*, 39 F.4th 835, 842 (7th Cir. 2022) (quoting *Kingsley*, 576 U.S. at 397). Also considered are "the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," with courts "appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 576 U.S. at 397 (internal quotation marks omitted). Factors bearing on the "reasonableness or unreasonableness of the force used" include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

## A. Count I: Anderson's Use of Excessive Force

Both sides agree that Anderson purposely and knowingly used pepper spray against Johnson. Thus, the question under *Kingsley* is whether that action was objectively unreasonable. Johnson argues that it was, contending that he was never a threat to himself, other inmates, or CCDOC staff because he was handcuffed in a secure room and at all times outnumbered by officers. Johnson adds that Anderson's failure to pursue alternative means of resolving the

issue—such as continuing to search for his belongings—compounds the unreasonableness of her conduct.

As an initial matter, the use of pepper spray against a detainee is not unconstitutional *per se*. *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment"); *Burton v. Ruzicki*, 285 F. App'x 882, 885 (7th Cir. 2007) (holding in the context of a Fourteenth Amendment claim brought by a pretrial detainee that use of pepper spray was not excessive when "in respons[e] to an inmate who refused to obey [officers'] orders"). Indeed, when used to restore discipline in custodial facilities, courts have found that the use of pepper spray does not amount to excessive force. *See Carr v. Beth*, 465 F. App'x 567, 571 (7th Cir. 2012) (upholding dismissal of excessive force claim where "a finder of fact could not reasonably infer from the [use of pepper spray] that [the defendant's] motive was anything more than a need to restore discipline").[6] But, if deployed "gratuitous[ly] or unprovoked, courts often have considered it excessive." *Brooks v. City of Aurora*, 653 F.3d 478, 487 (7th Cir. 2007) (collecting cases).

Significantly, the video evidence shows that Anderson told Johnson to leave the room in excess of ten times over the course of approximately thirty seconds before resorting to pepper spray. In other words, she did not spray Johnson immediately—she did so only after he continuously disobeyed her instructions. Although Johnson states that he never refused to leave the room, the footage plainly depicts otherwise. Thus, this dispute is not genuine. *McCottrell*,

---

[6] *Burton v. Ruzicki,* 285 F. App'x 882, and *Carr v. Beth*, 465 F. App'x 567, are unpublished Seventh Circuit orders issued after January 1, 2007. Although not precedential, the reasoning in the orders is persuasive and provides a useful point of comparison here. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b).

14

933 F.3d at 661. Specifically, the footage shows Johnson protesting inside of the room for almost thirty seconds instead of following Anderson's myriad requests to exit. That Anderson repeated her instruction many times instead of spraying Johnson right away indicates an effort on her part to temper, limit, or otherwise avoid the use of force, which, in turn, supports the reasonableness of her eventual action. *Kingsley*, 576 U.S. at 397.

Furthermore, Anderson deployed a single burst of pepper spray in response to persistent recalcitrance. No reasonable juror could find that Anderson used pepper spray gratuitously. *See Soto*, 744 F.2d at 1270; *Ruzicki*, 285 F. App'x at 885; *Carr*, 465 F. App'x, at 571. Nor could a reasonable juror find that Anderson's use of pepper spray was unprovoked. To the contrary, from being spontaneous, the undisputed facts show that the use of pepper spray was a pre-planned action prompted by Johnson's prolonged refusal to leave the meeting room.

Courts also consider the severity of the underlying problem that culminated in the use of force. *Kingsley*, 576 U.S. at 397. Johnson characterizes the issue here as missing property, contending that this alone is not serious enough to warrant pepper spray. But, in so arguing, Johnson ignores CCDOC's legitimate interest in managing its facility, which plainly includes the completion of housing reassignments. The Court is also unpersuaded by Johnson's assertion that Anderson should have pursued alternative means of resolving the issue, such as continuing to search for his belongings. Once again, Johnson neglects CCDOC's interest in managing in its facility, personnel, and protocol according to its own judgment—not that of detainees. What is more, Anderson **did** first pursue an alternative course of action: she asked him to leave the room voluntarily many times to no avail. Contrary to Johnson's characterization, the impasse here implicated order, discipline, and CCDOC's internal operation—not simply missing items. Such an important concern supports the reasonableness of Anderson's action.

The extent of Johnson's injury is also salient. *Id.* Here, Johnson complains of blunt trauma head and back pain. Importantly, Johnsons argues in his response brief that these injuries resulted from being slammed onto the ground, which occurred ***after*** he was sprayed. The absence of any injury traceable to pepper spray further indicates that Anderson's use of force was not objectively unreasonable.

In sum, from the perspective of a reasonable officer whose interests included managing the facility and preserving order, no reasonable juror could find that a pre-planned, single burst of pepper spray was objectively unreasonable in the context of Johnson's repeated refusal to obey instructions during a housing reassignment. Anderson is therefore entitled to summary judgment as to Count I.

### B.      Count II: Day's Failure to Protect and Intervene

With Count II, Johnson claims that Day failed to protect him from—or intervene in—excessive use of force. Neither Johnson's FAC nor his response brief develops this claim as to Day individually. Nevertheless, the parties agree that Day observed Anderson's use of pepper spray along with the subsequent take down in the hallway. Thus, the Court will consider both events in its analysis.

As a preliminary matter, Johnson's styles his claim as the "Failure to Protect and Intervene," seemingly implicating two discrete causes of action within a single Count. The Court construes this as an effort to assert both. Johnson's failure-to-protect claim is subject to the standard set out in *Kingsley*; he must show that Day's conduct was (i) purposeful, knowing, or reckless; and (ii) objectively unreasonable. *Kemp*, 27 F.4th at 498; *see also Miller v. Mascillino*, No. 15-cv-11746, 2023 WL 6276526, at *7 (N.D. Ill. Sept. 26, 2023) (reciting elements of failure-to-protect claims after *Kemp*). The elements of Johnson's failure-to-intervene claim are different insofar as Day, the bystander, may be held liable if she "(1) had reason to know that a

fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009).

Although the elements are distinct, both causes of action share a common thread. If no reasonable juror could find that the underlying use of force was objectively unreasonable, it follows that Day acted reasonably when she did not protect Johnson from such force. Likewise, Johnson's failure-to-intervene claim cannot succeed if there is no excessive force in the first place; in this instance, excessive force is required by the first element.[7] *See Ward v. Brown*, No. 18-cv-02798, 2022 WL 1404824, at *7 (N.D. Ill. May 3, 2022) (explaining that a plaintiff bringing failure-to-protect and failure-to-intervene claims after *Kingsley* must show that the defendants' conduct was "objectively unreasonable").

Accordingly, the Court begins by considering whether the underlying use of force was excessive. Having found that Anderson's use of pepper spray was not excessive, the Court turns to the events that took place after Johnson was sprayed. Here, Johnson argues that the officers used excessive force when they slammed him to the ground during the "take down" maneuver. That action was objectively unreasonable, Johnson contends, because Defendants made no prior effort to escort him to his new assignment and, furthermore, he never resisted. In addition, Johnson points to the severity of the physical injuries he purportedly incurred as a result of the take down. Specifically, Johnson states that he suffered an abrasion above his eye, adding that he

---

[7] The first element in a failure-to-intervene claim states that the bystander-defendant must have reason to know that a fellow officer was using "excessive force ***or*** committing a constitutional violation." *Lewis v. Downey*, 581 F.3d at 472 (emphasis added). Although the syntax is conjunctive, Johnson does not allege any constitutional violations separable from the use of excessive force.

was also diagnosed with blunt head trauma and a back injury, prescribed clutches and pain medication, and referred for ongoing physical therapy.

Courts consider whether the plaintiff was actively resisting. *Kingsley*, 576 U.S. at 397. Johnson argues that he never resisted. But, even setting aside Johnson's earlier refusal to leave the meeting room, this claim is blatantly contradicted by the video evidence in two additional ways. Approximately ten seconds before the take down, as Johnson is standing against the wall, the video footage shows the officers telling Johnson to "turn around" so that they can pull up his pants. The officers repeat this request seven times. Johnson, however, says "no" twice. He adds that the officers will "have to spray [him]." Moreover, Johnson also resisted immediately prior to the take down order. According to Defendants, the officers noticed an item in Johnson's waistband and sought to ensure that it was not weapon. While Johnson admits that he had an item in his waistband, he asserts that the officers knew it was a bundle of mail. Indeed, the footage shows an officer reaching for Johnson's waistband. In response, Johnson states "don't touch my mail" before moving his body from side-to-side. The parties dispute the nature of Johnson's movement: Defendants claim that Johnson flailed his arms and legs combatively, while Johnson asserts that he did not resist. But, even after drawing all reasonable inferences in Johnson's favor, the footage shows—unmistakably—that Johnson shakes his arms and legs in an abrupt manner. This action, combined with his prior verbal refusals, clearly constitute ongoing resistance to the officers' attempts to pull up his pants and retrieve the item in his waistband. No reasonable juror could find otherwise. Altogether, Johnson's resistance bears on the reasonableness of the takedown.

An effort to first limit or temper the need for force indicates whether such force is ultimately reasonable. *Kingsley*, 576 U.S. at 397. Johnson claims that the officers did not attempt

to escort him to his housing assignment, contending that this failure renders the use of force unreasonable. Even apart from Anderson's initial effort to escort Johnson from the meeting room, the video evidence again contradicts Johnson's claim. Approximately forty seconds before the take down occurred, Johnson is shown lying on the floor surrounded by officers. At one point, none of the officers are touching him and, at the same time, Anderson tells Johnson three times to "get up." Johnson does not stand voluntarily and instead remains on the floor. To be sure, the footage shows that Johnson complains of back pain while lying on the floor. And perhaps that is why he did not stand up when instructed. But even after crediting that inference in Johnson's favor, the footage nevertheless depicts some effort on the part of the officers to limit the need for force. In other words, the takedown occurred after various efforts to escort Johnson had failed.

The extent of Johnson's injury is also pertinent. *Kingsley*, 576 U.S. at 397. Citing the testimony of the treating physician at Stroger Hospital, Johnson contends that he suffered an abrasion above his right eye, that he was diagnosed with back injury and blunt head trauma, that he was prescribed pain and crutches, and that he was referred to physical therapy. It is undisputed that Johnson suffered an abrasion. However, as to the back injury, the record only shows that Johnson reported a back injury. This is distinct from a formal diagnosis. And moreover, the physician testified that the examinations performed did not reveal any back injury. While it is true that Johnson was diagnosed with blunt head trauma, Johnson omits that, according to the physician's testimony, this diagnosis was based on Johnson's own unverified report that he lost consciousness. Even if the Court accepts that Johnson reported a back injury and was diagnosed with blunt head trauma, the undisputed evidence confirms that the head, spine, and neurological examinations Johnson received on the day of the incident all returned

normal results. Also significant is the undisputed evidence that the head examination Johnson received years later in 2022 returned a normal result as well. Taken together, the medical results cut against the severity of Johnson's injury. True, the undisputed evidence shows that Johnson left Stroger Hospital with an abrasion, pain medication, crutches, and a referral for physical therapy. However, given the facts and circumstance of this case, particularly Johnson's persistent disobedience, no reasonable juror could find Johnson's injury inconsistent with objectively reasonable force.[8]

Lastly, the Court in its consideration of objective unreasonableness must account for what the officers knew at the time. *Thomas*, 39 F.4th at 842. Here, the undisputed evidence shows that the officers who took down Johnson were at the scene from start to finish, beginning with Anderson's initial attempt to escort Johnson out of the meeting room. As such, the officers observed Johnson's repeated refusal to obey orders over a period of several minutes. This bolsters the reasonableness of the take down insofar as the officers did not resort to the forceful maneuver right away. Instead, they did so only after observing many verbal requests fail over the course of several minutes.

In sum, no reasonable juror could find either Anderson's use of pepper spray or the officers' takedown objectively unreasonable after considering Johnson's continued physical and verbal resistance and  CCDOC's legitimate interest in a disciplined and orderly facility. Absent

---

[8] Johnson does not cite the opinion of his expert witness, Keona Marshall, LPN, in an effort to demonstrate a genuine issue of fact as to the reasonableness of the force to which he was subjected. Nonetheless, the Court has reviewed that opinion (which is the subject of Defendants' motion to bar expert evidence (Dkt. No. 74)) and finds nothing that alters the analysis of Johnson's claims. In addition to noting Johnson's diagnosed back injury and blunt head trauma from the 2017 incident, Marshall goes on to find that Johnson continues to suffer recurring headaches and momentary memory losses, which "may impact his quality of life with risk of mental health or sleep issues." (Expert Rep. of Keona Marshall ¶¶ 27–29, Ex. A to Defs.' Motion to Bar, Dkt. No. 74-1.) Drawing all reasonable inferences in his favor with respect to Marshall's proffered expert opinion, the Court still concludes that Johnson fails to demonstrate a triable issue of fact with respect to the object reasonableness of the officers' conduct.

excessive force, Day cannot be held liable for a claim of failure-to-protect or failure-to-intervene. Day is therefore entitled to summary judgment on Count II.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Dkt. No. 63) is granted. The Clerk is directed to enter Judgment in favor of Defendants.

ENTERED:

Dated:  March 31, 2025

Andrea R. Wood
United States District Judge